IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

AUG - 4 2003

MARKUS B. ZIMMER, CLERK
BY_____
DEPUTY CLERK

---

SCENIC AVIATION, INC., a Utah
Corporation,

Plaintiff,

vs.

JAMES BLICK, DARCY MCCRACKEN,
NICO SIMPONIS, and JACK MALONE,

Defendants.

**OPINION GRANTING SUMMARY
JUDGMENT FOR DEFENDANTS
MCCRACKEN AND SIMPONIS**

Case No. 2:02-CV-01201 PGC

---

This case involves an attempt by the plaintiff, Scenic Aviation, Inc., to enforce a non-solicitation covenant purportedly signed by the defendants. Scenic alleges it is an air ambulance company that provides services to five medical facilities in Arizona, primarily on the Navajo and Hopi Indian Reservation. The defendants worked as a pilot, a flight nurse, and a paramedic on Scenic's flights.

Before the court is a motion by two of the defendants – Nico Simponis and Darcy McCracken – seeking summary judgment on all claims against them. Their motion centers on the claim that Scenic is not the proper plaintiff in this action. Simponis and McCracken argue that, while Scenic was their employer, Scenic only leased their services to Eagle Air Med Corporation. Since Eagle



Air Med is the only air ambulance service accredited by the relevant accrediting agency, Simponis and McCracken assert that they could not have violated any covenant not to solicit customers of Scenic.

While Simponis and McCracken's technical argument about proper plaintiff has merit, it appears that the problems raised could conceivably be resolved by amending the complaint.  The court prefers to proceed directly to the heart of this dispute: whether Scenic can restrain Simponis and McCracken from competing against it.  The court concludes that any such restraint in this case is unenforceable because enforcement of the non-solicitation clause would unfairly   limit competition and likely limit the delivery of critical medical services to an area that has long been under-served.  Accordingly, summary judgment is proper for these defendants on the claims arising out of the covenant not to compete and all other claims, which are ancillary to it.  This opinion explains the reasons for this conclusion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Scenic's complaint in this case is premised on a violation of a non-solicitation clause in an Employment Agreement allegedly signed by the defendants.  The defendants were employees of Scenic and worked for Scenic on air ambulance flights as a flight nurse (McCracken), a flight paramedic (Simponis), and a pilot (Blick).  Most of Scenic's air ambulance work is done for five hospitals located in remote areas in the southwestern United States: Fort Defiance PHS Indian Hospital located in Window Rock, Arizona; Chinle Comprehensive Health Care Facility, located in Chinle, Arizona; Kayenta PHS Indian Hospital, located in Kayenta, Arizona; Hopi Health Care Center, located in Keams Canyon, Arizona; and Sage Memorial Hospital, located in Ganado,

Arizona. These are all areas that lack extensive transportation infrastructure and have long had insufficient medical services. Most of these areas are located within the Navajo and Hopi Nations.

Scenic claimed that the defendant employees had violated their Employment Agreements. The contract signed by Blick and McCracken contained the following provisions:

> Employee will have access to and help develop the goodwill of the Company and will be called upon to work closely with customers and employees of Company in performing services under this Agreement. All information about such customers and employees which becomes known to Employee during the course of employment is a Trade Secret of Company and shall not be used by Employee in soliciting or taking away customers or employees of Company after termination of the Agreement.

> Without limiting the preceding paragraph, the employee shall not for a period of one (1) year immediately following the termination of his/her employment with the Company, either directly or indirectly, call on, solicit, or take away or attempt to call on, solicit or take away, any of the customers of the Company on whom the Employee called or with whom he/she became acquainted during his/her employment with the Company either for himself/herself or for any other person, firm or corporation, unless specifically authorized in writing by the President of the Company.

> Employee stipulates and agrees that the terms of this nonsolicitation agreement are reasonable and necessary to protect the legitimate business interests of the Company and that this agreement will not preclude Employee from having a living if Employee leaves the employment of the Company. In the event of a breach or threat of breach by employee of this agreement, Employee acknowledges that the remedy of the Company for such breach or threat of breach shall be inadequate at law, and agrees that the Company shall be entitled to an injunction reserving such breach or threatened breach, in addition to any other remedy provided at law or in equity all of which shall be cumulative and not exclusive.

James Blick signed a contract containing this provision on June 19, 2002. Darcy McCracken signed a contract with this provision late at night on October 19, 2002. This court has never received a copy of a signed contract from Mr. Simponis. Early in the morning of October 19, 2002, Bowers and Hunt approached the defendants after midnight, at the end of an eight hour shift, and asked them to sign an Employment Agreement. Simponis refused, and resigned shortly thereafter. McCracken

3

asked what would happen if he did not sign, and it was told he would be "off the schedule," meaning

not paid, until he signed.  Mr. McCracken quickly reviewed the contract and signed.  McCracken left

Scenic six days later on October 25, 2002.  According to Blick, another defendant, who left Scenic

with McCracken and Simponis, Simponis later stated he remembered signing an employment

agreement, prior to October 2002.

The complaint alleged that the defendants started a competing air ambulance service "Stat

Air."  The facts regarding the competing service do not appear to be in dispute.  Blick  met with

both McCracken and Simponis during October 2002.  Blick agreed to find an operator with an FAA

certificate who could be used to supply aircraft for the new company.  Blick contacted David Fenner,

who had an FAA certificate and who was not an employee of Scenic.  Fenner agreed to provide

financing and aircraft for the new company, to be known as "Stat Air."

In October 2002,  Blick approached numerous pilots employed by Scenic in an attempt to

recruit them to Stat Air. According to Blick, McCracken and Simponis also attempted –

unsuccessfully – to recruit other Scenic employees.  Dr. Gary Herring was also recruited to join Stat

as a co-owner. Herring was manager of the emergency room at Fort Defiance PHS Indian Hospital

and was responsible for choosing which air ambulance service would be used when such services

were needed.  McCracken, Simponis, Fenner, Herring, and Blick established a business plan for Stat

Air under which it would service Fort Defiance PHS Indian Hospital, Chinle Comprehensive Health

Care Facility, Hayenta PHS Indian Hospital, Hopi Health Care Center, and Sage Memorial Hospital.

McCracken, Simponis and Blick still worked for Scenic during these meetings.

4

Stat Air was actually formed sometime in November 2002. It existed on paper as a separate corporation, but leased aircraft from Sun West Aviation, Inc., a company owned by David Fenner. Shortly after starting Stat Air, in November 2002, Blick, McCracken and Simponis learned that the Indian Health Service (IHS) required all air ambulance service providers to be CAMTS accredited. When it became clear that Stat could not obtain CAMTS accreditation in a timely manner, McCracken, Simponis, Herring, Fenner and Blick, sought to find a different air ambulance service that was already accredited. Shortly thereafter, the defendants approached AeroCare Medical Transport, Inc, a company that did have CAMTS certification. AeroCare agreed to act as the "operator" of the air ambulance service. Under the arrangement, Fenner's company (Sunwest Aviation, Inc.) agreed to act as vendor for AeroCare. McCracken and Simponis went to work for AeroCare as part of their medical crew in January 2003. Notably, neither AeroCare, Sunwest, Fenner nor Herring are named parties in this litigation. AeroCare was paid by hospitals and shared revenue with Fenner, Herring, McCracken, Simponis and Blick on a per-flight basis. McCracken and Simponis remain employed by Stat Air until January 2003, when they left to work for AeroCare.

As a result of these two months of competition, Scenic alleges that it lost revenues. Prior to the entry of Stat Air into the market, Scenic had a monopoly over air ambulance service to certain IHS hospitals. Scenic's complaint, filed on November 4, 2002, alleged seven causes of action, specifically (1) breach of contract, specifically breach of the covenant not to solicit; (2) breach of implied covenant of good faith and fair dealing, (3) interference with economic relations, (4) conversion, (5) disloyalty/breach of fiduciary duty, (6) civil conspiracy, and (7) unfair competition.

On December 19, 2002, Scenic sought a preliminary injunction. The court denied the injunction on several grounds, but three critical factors influenced its decision. First, Scenic and Stat Air primarily served the populations of Navajo and Hopi Reservations. The court concluded it would be unwise public policy to limit the ambulance services to these remote hospitals. Secondly, Scenic had failed to demonstrate why its alleged injuries were not recoverable as monetary damages. Finally, on the issue of "success on the merits" the court expressed concern about the lack of a signed contract between Mr. Simponis and Scenic; and concerns about overreaching by Scenic when Mr. McCracken signed his contract.

Unbeknownst to this court, on December 11, 2002, CAMTS suspended Eagle Air Med's accreditation as an air ambulance provider. On January 24, 2002, Eagle brought suit against CAMTS to reinstate its accredited status, again seeking a preliminary injunction, this time from Judge Kimball. In Eagle's complaint, Eagle alleged losses of $4400 a day in net revenues, and a loss of $350,000 between December 12, 2002 and January 11, 2003, due to its lost accreditation status.

On April 16, 2003, defendants Simponis and McCracken filed a motion for summary judgment. They contended that, although Scenic was defendants' employer, Scenic only leased defendants' medical services to Eagle Air Med Corporation. Eagle Air Med and Scenic are two separate corporations. Only Eagle Air Med is an air ambulance service. Therefore, Simponis and McCracken contend they did not violate any agreement forbidding solicitation of Scenic's customers, since only Eagle Air Med had customers.

Simponis and McCracken further observe that Scenic, in its pleadings listed Eagle as its "dba," but this "dba" is not registered with the Utah Department of Commerce. Scenic and Eagle have separate offices in Blanding, Utah, but are located in the same building.

In support of its contentions about the distinction between Scenic and Eagle, defendants cite extensively from another lawsuit filed in this court: *Eagle Air Med Corporation v. Commission on Accreditation of Medical Transport Systems (CAMTS)*.[1] This lawsuit arises out of CAMTS's suspension, on December 11, 2002, of Eagle Air Med's accreditation. On February 10, 2003, by court order from Judge Kimball of this court, Eagle's CAMTS certification was reinstated, until a trial on the merits on issues surrounding Eagle's loss of CAMTS certification. This lawsuit was brought only by Eagle, and Simponis and McCracken, contend that this demonstrates that the two companies are separate entities. Simponis and McCracken argue that in that suit Scenic did not lose its accreditation only Eagle did.

In response, Scenic frankly acknowledges that "Scenic and Eagle are separately incorporated and observe appropriate corporate formalities." Moreover, Scenic does not dispute that the defendants' contract was with Scenic, the defendants were paid by Scenic, and the defendants were Scenic employees. Scenic also concedes that it did not have relationships with the hospitals in question, nor earn revenue directly from them; rather, Eagle did and then shared that revenue with Scenic. Scenic maintains, that because the two companies operated under a "joint agreement," this court should recognize their status as one company.

---

[1] No. 2:03CV00093 (D. Utah Jan. 24, 2003).

**STANDARD OF REVIEW**

The standards for summary judgment are well known.  A party is entitled to summary judgment when the nonmoving party fails to show that there is a genuine issue for trial.[2] The primary purpose of a motion for summary judgment is to pierce the allegations in the pleadings and demonstrate that genuine issues of material fact are lacking.[3]

**DISCUSSION**

**I. Eagle Air Med as the Proper Plaintiff.**

The focus of the defendants' motion for summary judgment is the claim that Eagle Air Med, rather than Scenic, is the proper plaintiff.  First and foremost, Eagle is not mentioned or listed anywhere on the contract in question.  Scenic paid the defendants, and Scenic acknowledges in its petition the organizations are "two separate companies."  Furthermore, Eagle sought revenue from CAMTS for lost flights, yet Scenic also sought revenue from Simponis and McCracken for lost flights. Scenic's contention that it is really Eagle calls into question Scenic/Eagle's choice to seek damages from two different sources for the same lost flight revenue.  It is undisputed that Scenic did not provide air ambulance service and Eagle was not a party to the contract.  On these grounds, the court could well rule in favor of the defendants.

Resting judgment on these rather technical grounds, however, does not appear to be the best way to resolve this case.  Such a disposition might be viewed as elevating form over substance and might lead, for example, to subsequent motions by Scenic to amend its complaint to include Eagle

---

[2]*See Hom v. Squire,* 81 F.3d 969, 973-74 (10th Cir. 1996).

[3]*See* FED. R. CIV. PRO. 56(c).

8

Air Med as a plaintiff. Rather than rest on these narrow grounds, the court prefers to tackle head on the question of whether either Scenic (or Eagle Air Med, for that matter) can restrain the defendants from competing in the air ambulance business. Both parties have essentially briefed this issue when briefing the motion for a preliminary injunction.

### II. Claims against McCracken and Simponis

#### A. Invalidity of the Non-Solicitation Clause

Scenic's entire complaint revolves around the restrictive employment covenant that, Scenic contends, has been signed by all three defendants before the court. One threshold question deserves brief discussion. It is undisputed that Scenic has not provided an executed employment agreement from Mr. Simponis, which would be sufficient grounds for summary judgment rejecting the breach of contract claim. However, Scenic contends that Simponis admitted to a co-defendant – Mr. Blick – that he (Simponis) had signed an employment agreement. Scenic has provided no specific terms of this agreement, and any such proposed terms would be pure speculation. However, for purposes of this motion the court will assume that Simponis agreed to the same non-solicitation clause as defendants McCracken and  Blick.

Scenic suggests that Utah law governs this issue, and the court will proceed on that basis. Under Utah law, restrictive employment covenants are enforceable if carefully drawn to protect only the legitimate interests of the employer.  As the Utah Supreme Court explained in *Robbins v. Findlay*:

> Covenants not to compete are enforceable if carefully drawn to protect only the legitimate interests of the employer. The reasonableness of a covenant depends upon several factors, including its geographical extent; the duration of the limitation; the nature of the employee's duties; and the nature of the interest which the employer

9

seeks to protect *such as trade secrets, the goodwill of his business, or an extraordinary investment in the training or education of the employee.* In a general sense, the law balances the nature of the interest of one seeking to enforce such a covenant, whether by injunction or by stipulated damages, against the hardship imposed on the employee as the result of the restraint. *Covenants not to compete which are primarily designed to limit competition or restrain the right to engage in a common calling are not enforceable.*[4]

Based on these factors, the court concludes that the undisputed facts establish that the particular covenant at issue here is not enforceable as to the particular defendants before the court.

A restrictive covenant is only enforceable where it is needed to protect such things as "trade secrets, the goodwill of [a] business, or an extraordinary investment in the training or education of an employee." Scenic argued in its motion for preliminary injunction it needed this clause to protect both its trade secrets and its goodwill. The trade secret contention can be quickly dispatched. Scenic claims the names of the employees working at these hospitals and making air ambulance decisions were "trade secrets." To consider this list of contacts, information easily obtainable through any number of sources, the property of Scenic stretches the trade secret doctrine to the point of "unrecognizability."[5] A customer list that is easily reproducible through the simple process of looking up the names and addresses of hospitals and clinics in a telephone directory is not protectable as a trade secret.[6]

---

[4] *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah 1982) (emphases added) (citations omitted).

[5] *See Renee Beauty Salons, Inc., v. Blose-Venable*, 652 A.2d 1345, 1349 (Pa. Sup. Ct. 1995), *appeal denied*, 661 A.2d 874 (Pa. 1995).

[6] *Robbins*, 645 P.2d at 628 n. 10 (1982) *citing Microbiological Research Corp. v. Muna, Utah,* 625 P.2d 690 (Utah 1981).

Scenic also argues that Eagle's CAMTS compliance manual qualifies as a trade secret. However, even assuming the disk came from Simponis, as Blick implies, CAMTS compliance information is readily available from CAMTS itself and therefore is not a "trade secret" of Scenic or Eagle.

Scenic also raises the need to protect its goodwill, claiming that its relations with the IHS hospitals needed to be protected through the non-solicitation clause.  Scenic maintains that the relationship that McCracken and Simponis established with the IHS hospitals was the sole basis for the hospitals' choice of air ambulance service, and was "goodwill" in need of protection.  First, the covenant, as to McCracken and Simponis, only applies to Ft. Defiance, not all IHS hospitals.  Scenic in its pleadings only alleges lost flights from Ft. Defiance, and discusses how McCracken and Simponis lived near Ft. Defiance.  They could not have been at Ft. Defiance almost daily and also built up goodwill at other hospitals simultaneously.  The only real issue is whether the non-solicitation clause barred their solicitation at Ft. Defiance.

Scenic argues it has a legitimate interest in protecting its goodwill with Ft. Defiance.  Any interest, however, would be slim. In Eagle's complaint in the CAMTS suit, Eagle indicates that to "further develop its goodwill and reputation" it had been engaged in a major marketing campaign throughout 2002, without any mention of Scenic employees McCracken and Simponis.[7]  The only potential goodwill at issue in this case would have been developed by fairly low-level personnel on their day-to-day operations.  Moreover, Scenic acknowledges that Dr. Herring, as director of the emergency room at Ft. Defiance, made the ultimate decisions on air ambulance services, and could

---

[7] *Eagle v. CAMTS,* 2:03CV00093 DAK, Complaint, p. 8, #39.

11

only approve ambulance services that held a CAMTS certification.[8]  In fact, Dr. Herring himself owned a portion of Stat Air, the air ambulance business the defendants started.  The great bulk of any "goodwill" that Scenic possesses in its operations presumably comes from the fact that IHS hospitals must chose a CAMTS certified air ambulance service. This fact is further evidenced by Eagle's complaint in the CAMTS suit alleging $350,000 in lost revenue, and 78 lost flights, in the one month following suspension of its CAMTS certification.  Scenic's  "goodwill" is, therefore, almost entirely due to Eagle's CAMTS certification, rather than to any personal relationship that McCracken and Simponis (among others) may have established with these hospitals.

For all these reasons, it appears that Scenic has little legitimate basis for a restrictive covenant.  On the other hand, compelling reasons weigh against enforcing any covenant in this case. First, *Robbins* instructs that covenants that "restrain the right to engage in a common calling are not enforceable."[9]  In *Robbins*, the court concluded that a covenant not to compete imposed on a hearing aid salesman was a unreasonable and unenforceable due to his employment in a  "common calling." The court concluded that the employer had made no showing that his services were sufficiently "special, unique, or extraordinary," to justify the restraint on employment, even though they had demonstrated that his value to his employer was high. [10]  The court concluded that even if he was especially proficient in his work, "[t]he efficiency and skills which an employee develops through

---

[8] *See Eagle v. CAMTS,* 2:03CV00093, #31.

[9] *Robbins*, 645 P.2d at 627.

[10] *Id.*

12

his work belong[s] to him and not to his former employer."[11] Scenic, in its complaint, has alleged

nothing indicating that McCracken and Simponis' skills were special, unique or extraordinary.

These two defendants were emergency medical staffers, and Scenic has not alleged they had any

unique responsibilities other than taking care of individuals that had the misfortune of being injured.

Had the defendants been salespeople with access to confidential information[12] or higher level

executives in Scenic with knowledge of product development,[13] the outcome might be different.

Scenic has not alleged facts supporting a conclusion that McCracken and Simponis possessed

"unique, special, or extraordinary" skills sufficient to justify a restraint on their future employment.

In reviewing restrictive covenants, the court must balance the hardship imposed on the

employee, by restraint on his ability to practice his trade, against the nature of interest of the

employer. [14] *Robbins* further instructs that "[c]ovenants not to compete which are primarily designed

to limit competition . . . are not enforceable."[15] The undisputed facts here show that Scenic primarily

designed its covenant to limit competition.  Obviously, the inability of Scenic to point to legitimate

reasons for the covenant suggests that conclusion.  Moreover, in contrast to the normal market with

an abundance of competitors, Scenic apparently had monopolistic control over the delivery of

medical transportation services to Ft. Defiance.  In the absence of other actual reasons for the

---

[11] *Id.* at 62 *citing Hallmark Personnel of Texas, Inc. v. Franks,* 562 S.W.2d 933, 936 (Tex. Ct. App. 1978).

[12] *See Kasco Services Corp. v. Benson*, 831 P.2d 86, 87 n. 2 (Utah 1992)

[13] *See System Concepts, Inc. v. Dixon*, 669 P.2d 421, 426 n. 11 (Utah 1983).

[14] *See Robbins*, 645 P.2d at 627.

[15] *Robbins*, 645 P.2d at 627.

covenant, preservation of Scenic's monopolistic power seems to have been the real motivation for the restriction.  As one court noted in assessing a similar covenant:

> It is clear that the broad sweeping language is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness.  It does no more than badly restrain competition. This it may not do.[16]

When balancing the restriction on future employment of low-level employees, such as McCracken and Simponis against Scenic's desire to maintain a hold on the flights coming out of Ft. Defiance, the scales easily tip in favor of the defendants.

Additionally, the vague language of the covenant itself supports a conclusion that this restrictive covenant is non-enforceable.   The covenant appears to be a "form" agreement without much specificity.  Once terminating employment with Scenic, employees are prevented from either "directly or "indirectly" calling, soliciting, or attempting to call on or solicit or take away any customers of the "Company." The contract does not define "indirect contact," and the court will not try and fill in the definition.  The term "customers" is unclear as well, particularly in light of the Scenic versus Eagle confusion.  Finally, it is unclear, at best, whether the "Company" referred to is either Scenic or Eagle.  The vague provisions in the contract further supports this court's conclusion that the clause is unenforceable.

In considering the reasonableness of Scenic's restriction, that court has given considerable attention to the fact that defendants are involved in delivering potentially life-saving medical services to a remote and under served area.  In employment within the medical profession in particular, courts

---

[16] *Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A Corp.*, 42 N.Y.2d 496 (N.Y. 1977) (*cited in Robbins*, 645 P.2d at 628).

frequently consider the public interest in evaluating any restrictive employment covenant.[17]   Here, the public interest consideration tips the balance decisively against restricting medical services.

It is obvious that there is a compelling need for medical services in the remote locations served by Scenic. Eagle acknowledges it is the only air ambulance service operating out of Kayenta and Chinle, Arizona. Scenic admitted there is a "constant and critical need" for medical staff in the area at issue that the "public interest is served by having more, not fewer air ambulance services to respond to the emergency medical needs of the Navajo nation."[18]

Courts have strictly scrutinized covenants not to compete when they interfere with the delivery of medical services.   Though not binding on this court, the Arizona Supreme Court's decision in *Valley Medical Specialists v. Farber*[19] is instructive on this point.   In that case, the court refused to enforce a non-compete clause that restricted a physician's right to practice medicine because of public policy considerations.   The Arizona Supreme Court affirmed a trial judge's decision finding that a restrictive covenant forbidding a pulmonologist from competing within a specified area was "unreasonably broad and against public policy."[20]   The court noted a number of problems with the covenant, including its lack of an exception for emergency medical treatment and

---

[17]  *See New Castle Orthopedic Associates v. Burns*, 392 A.2d 1383, 1387 (Pa. 1978); *Valley Medical Specialists v. Farber*, 982 P.2d 1277, 1281 (Ariz. 1999); *Iredell Digestive Disease Clinic, P.A. v. Petrozza,* 373 S.E.2d 449  (N.C. Ct. App. 1988).

[18]Scenic's Resp. to Defendant's Facts paragraph 30.

[19]  982 P.2d 1277 (Ariz. 1999).

[20]  *Id.* at 1285.

impingement on "the sensitive and personal nature of the doctor-patient relationship."[21] The court

concluded:  "We stop short of holding that restrictive covenants between physicians will never be

enforced, but caution that such restrictions will be strictly construed." [22]

Other jurisdictions have been similarly concerned about the public policy ramification of

enforcing covenants not to compete that potentially block the delivery of medical services.[23]  The

Ohio Court of Appeals, for example, noted an "acute" measure of "disfavor" of restrictive covenants

among physicians because of their potential to harm the public interest.[24] The court held that such

covenants "should be strictly construed in favor of professional mobility and access to medical care

and facilities."[25]  Similarly, the Idaho Supreme Court has refused to enjoin competition by two

doctors practicing pediatrics and neonatology in a rural community, explaining:

> In our view, the critical focus should be upon the community where the restriction
> would apply. The known needs of that community are to be examined and weighed
> in determining whether specific enforcement is appropriate. . . . It has been shown,
> in this case, by sufficient competent, though disputed, evidence that the welfare of
> the public in the [rural] area would have been seriously impaired by enjoining [the
> doctors] from practicing their specialty.[26]

---

[21] *Id.*

[22] *Id.* at 1032.

[23] *See generally* Paula Berg, *Judicial Enforcement of Covenants not to Compete Between Physicians: Protecting Doctors' Interests at Patients' Expense*, 45 RUTGERS L. REV. 1, 28-30 (1992).

[24] *Ohio Urology, Inc. v. Poll*, 594 N.E.2d 1027,1031 (Ohio App. 1991).

[25] *Id.* at 1032.

[26] *Dick v. Geist*, 693 P.2d 1133 (Id. Ct. App. 1985).

The Supreme Court of Pennsylvania held that a lower court erred in enforcing a covenant barring an orthopedic physician from competing with his previous employer because the public's interest in having a sufficient number of orthopedic surgeons.[27] And the North Carolina Court of Appeals found that a restrictive covenant was not enforceable because it would result in a shortage of gastroenterologists in a particular area.[28] Presumably because of public interest concerns, several states have even enacted a flat statutory ban on covenants not to compete in physician employment contracts or partnership agreements.[29]

To be sure, these cases have generally arisen in the context of restrictions of a *physician's* ability to practice medicine, rather than the more specialized arena of air ambulance services. But the concern about harm to the public interest recognized in these various jurisdictions is equally valid in this case. The parties do not dispute the importance of air ambulance service in the remote areas involved in this case, which no doubt is literally of life-or-death importance to some patients who must be transported rapidly to see a physician.

In its motion in support of its request for a preliminary injunction, Scenic argues that the Utah Supreme Court's decision in *Kasco Services Corporation v. Benson*[30] compels this court to enforce the restrictive covenant. The court in *Kasco* enforced a covenant not to compete, holding that a sales representative who had regular and routine contact with customers had established goodwill entitling

---

[27] *See New Castle Orthopedic Assoc.*, 392 A.2d 1383.

[28] *See Iredell Digestive Disease Clinic, P.A.*, 373 S.E.2d 449.

[29] *See, e.g.,* Colo.Rev.Stat. § 8-2-113(3) (1986); Del.Code Ann. tit. 6, § 2707 (1993); M. G.L.A. 112, § 12X (1977).

[30] 831 P.2d 86 (Utah 1992).

his employer to enforce a covenant not to compete. Furthermore the court concluded that the representative's services were "special, unique and extraordinary."[31]   Indeed, the court held the representative was, for all intents and purposes, the company in the area in question.[32] The facts here are quite distinguishable.  In its complaint, Scenic describes Simponis and McCracken as a "flight paramedic" and a "flight nurse," not salespeople.  Second, the majority of their contact was with the Ft. Defiance Hospital, according to Scenic's complaint. They were not on a sales "route" as the defendant in *Kasco*, but were essentially only called to Ft. Defiance if – and only if – a medical emergency developed.  Their contact with Ft. Defiance was controlled by medical exigencies, not customer development.  Because McCracken and Simponis provided such medical services and did not operate on a regular sales "route" as sales personnel, *Kasco* is readily distinguishable.

A final point to consider in determining the reasonableness of the covenant are its temporal and geographic limitations.[33]  The covenant in this case specifies a one-year time restriction, which might be reasonable in other contexts.[34]  It does not, however, state a specific geographic restriction. The reasonableness of the restraints in restrictive covenants is determined on a case-by-case basis taking into account the particular facts and circumstances surrounding the case and the subject covenant.[35]  To resolve this issue, courts typically look at whether the business is question was

---

[31]  *Id.* at 88.

[32]  *Id.*

[33]  *System Concepts, Inc.*, 669 P.2d at 426.

[34]  *See id.* at 426, *citing* 41 A.L.R. 2d 179 (1955)

[35]  *System Concepts, Inc.*, 669 P.2d at 417, *citing Pancake Realty Co. v. Harber*, 73 S.E.2d 438 (W. Va. 1952).

"local."[36]  In this case, the very nature of "air" ambulance service and the large geography covered prevents this from being a "local" business. This factor, too, weighs against enforceability.

In short, balancing all of the relevant competing factors, the undisputed facts in this case demonstrate that the covenant at the heart of this lawsuit is unreasonable and therefore unenforceable. Scenic has scarcely any legitimate interest in enforcing the covenant while a number of factors – including principally the need to protect the public interest – argue against enforcement. For all these reasons, the court grants summary judgment for defendants on the breach of contract claim.

### B. Other Derivative Claims.

Most of the other claims in Scenic's complaint are all essentially derivative of the breach of contract claim.  With this linchpin claim removed, all other claims are without merit for similar reasons  – with the exception of the breach of loyalty and conspiracy claim, which is without merit for reasons requiring separate discussion.

### 1.  Breach of Covenant of Good Faith and Fair Dealing

In its complaint, Scenic also recasts the restrictive covenant claims as a breach of the covenant of good faith and fair dealing "implied in the Employment Agreement."[37]  In light of the court's determination that the nonsolicitation clause was unenforceable, McCracken, and Simponis did not violate any "implied" covenants in the agreement.  Therefore, summary judgment is proper on this cause of action.

---

[36]*Id. citing* Blake, Employee Agreements Not to Compete, 73 HARV. L.REV. 625 (1960).

[37]  Complaint paras. 32-34.

### 2. Interference with Economic Relations

Scenic next dresses up the restrictive covenant claim as an "interference with economic relations" claim.[38] This cause of action begins by contending that "[defendants] were aware of the other [defendants'] individual contract obligations to refrain from soliciting Scenic's customers."[39] Because the court has found those obligations unenforceable, the interference with economic relations claim cannot stand.

In addition, to prove a claim for interference with economic relations, Scenic must show that the defendants had "improper purpose or improper means."[40]  Improper means requires an act that is contrary to law.  A defendant's choice to merely further his own financial gain is insufficient to meet the "improper purpose" prong of the test.[41]  The defendants were seeking new employment, higher pay, and better working conditions, and thus did not have an "improper purpose" in their efforts to start Stat Air.   Summary judgment is therefore proper on this claim as well.

### 3. Conversion

In another variation of the restrictive covenant theme, Scenic pleads a cause of action for conversion.[42]  This cause of action contends that defendants "have converted for their own use and benefit the goodwill . . . [that] belongs to Scenic, as well as confidential information belonging to

---

[38]  Complaint paras. 35-40.

[39]  Complaint para. 35.

[40] *See Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307-308 (Utah 1982).

[41] *See id.* at 308-09.

[42]  Complaint paras. 41-45.

Scenic.["43] This cause of action is simply another repleading of the restrictive covenant claim. It is therefore rejected for the reasons the covenant claim was rejected.

As an independent reason for granting summary judgment on this cause of action, an action for conversion requires that Scenic prove that the act in question constituted an act of willful interference with a *chattel*, done without lawful justification by which the owner was deprived of its use and possession.[44] Under Utah law, conversion requires "chattel."[45] Scenic has not established the loss of chattel, it only alleges the loss of goodwill, employees and customers, which is insufficient to prove this claim.

Even assuming intangible property (e.g., goodwill) could be "converted," an additional flaw in this claim is that Scenic has not established exactly what trade secrets or goodwill the defendants actually converted. With respect to trade "secrets," the names and contacts at the various hospitals is information available to anyone who picked up a phone book. The only item that was arguably proprietary was Eagle's, *not Scenic's*, manual regarding CAMTS compliance. In any event, CAMTS makes the standards for accreditation available to those who seek this information. With respect to goodwill, the "goodwill" that Scenic had did not leave when the defendants left. The goodwill essentially resides in the CAMTS certificate, which the defendants did not take. For all these reasons, the court finds summary judgment proper for the defendants on this claim as well.

---

[43] *Id.* at para. 42.

[44] *Lake Philgas Service v. Valley Bank & Trust Co.,* 845 P.2d 951, 955 (Utah Ct. App. 1993).

[45] *See e.g. Alta Industries Ltd. v. Hurst*, 846 P.2d 1282, 1289 n.18 (Utah 1993).

*4. Unfair Competition*

Scenic next alleges that the defendants engaged in unfair competition against it.[46]  To the extent that this cause of action repeats the restrictive covenant claim, summary judgment is appropriate for the Simponis and McCracken as well.  To the extent that this cause of action goes any further, it is a bit cheeky (to the say the least) for a monopolist to allege a new competitor is competing unfairly based on nothing more than the competitor's entry into the market.  The complaint does not allege any specific facts that would support an unfair competition claim, and therefore any remaining portion of this cause of action is without merit as well.

## C.  Breach of a Duty of Loyalty and Conspiracy to Breach the Duty

The breach of loyalty claim (and related conspiracy claim) is not simply a variation on the covenant-not-to-compete theme.  It therefore deserves fuller discussion.

The final claim presented in Scenic's complaint is that the defendants breached a duty of loyalty to act in the best interests of Scenic.[47]  The complaint is not very specific on forms of the breach.  But the most substantive allegations appear to be that the defendants solicited customers of Scenic and co-workers at Scenic and that this was contrary to the best interests of Scenic.

Summary judgment on these claims is also appropriate, although this issue is closer than the others previously discussed.  With respect to the issue of the defendants soliciting Scenic's customers, the complaint does not specifically allege that the solicitation took place during

---

[46]  Complaint paras. 56-58.

[47]  Complaint para. 46-51.

defendants' employment at Scenic.  In the most extensive elaboration in the complaint, the only

specific allegation is made against defendant McCracken as follows:

> Acting in the name of Stat, and *just one day after* McCracken ended his employment with
> Scenic, McCracken signed and sent this document soliciting work from representatives of
> Fort Defiance hospital. In this documents, Defendants say they "look forward to continuing
> the close relationship" between them and the Fort Defiance Hospital staff.

This allegation alleges solicitation *after* McCracken left Scenic.  In such circumstances, there is no

breach of a duty of loyalty because the employment – and consequently the duty of loyalty – has

simply ended.[48]

With respect to defendants soliciting co-workers, the complaint does allege that this took

place during the defendants employment with Scenic.[49]  According to Scenic, the gist of this cause

of action is that the defendants held "meetings" during the time the defendants were employees at

Scenic to discuss forming a competing organization.  These discussion apparently included whether

the defendants (and perhaps other at-will employees) should leave Scenic.  Without more, these

general allegations are insufficient to survive a motion for summary judgment.   In general, an

employee "may make arrangements to compete with her employer before termination of employment

'except that [s]he cannot properly use confidential information peculiar to her employer's business

and acquired therein.'"[50]  As explained in a case cited by Scenic, "courts have recognized 'a privilege

in favor of employees which enables them to prepare or make arrangements to compete with their

---

[48] *See* Restatement (2d) Agency § 393 comment e.

[49] Complaint para. 21.

[50] *Western Medical Consultants, Inc. v. Johnson*, 80 F.3d 1331, 1336 (9th Cir. 1996)
(quoting Restatement (Second) of Agency § 393, comment e.

employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty.'"[51]   Preparation to begin competing can, in proper circumstances, include discussions with fellow co-workers.  The *Restatement (Second) of Agency* has noted:

> [I]t is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still employed, that they will engage in competition with the firm at the end of the period specified in their employment contracts.  However, a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements.[52]

Here, the defendants were low-level employees at Scenic.  The general principle of loyalty to one's employer is that a "corporate officer or other "high-echelon" employee is barred from actively competing with his employer during the tenure of his employment, even in the absence of an express covenant so providing.[53] Simply, while employed, a high-level employee must refrain from actively and directly competing with his employer.[54]  However, once the employment relationship comes to an end, the employee is at liberty to solicit his former employer's business, subject to concerns for

---

[51] *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 492 (Colo. 1989) (quoting *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 569 (Md. 1978).

[52] Restatement (Second) of Agency § 393, comment e.

[53] *See Maryland Metals, Inc.*, 382 A.2d at 568, *citing Ritterpusch v. Lithographic Plate Service*, 119 A.2d 392 (Md. 1956); *Becker v. Bailey*, 299 A.2d 835 (Md. 1973); Restatement (Second) of Agency sec 393 (1957); W. Fletcher, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS  856 (Perm. ed. 1975).

[54]*Id. citing C-E-I-R, Inc. v. Computer Dynamics Corp.*, 183 A.2d 374 (Md. 1962).

misuse of trade secrets and confidential information.[55] The policy underlying this favors free competition and recognizes a privilege in favor of employees that allows them to make arrangements to compete with their employers prior to leaving their employment without fear of incurring liability for breach of their duty of loyalty.[56] Courts have not found a breach of duty even when employees purchased a rival business[57] or advised customers of their imminent departure.[58] Courts have found a breach of the duty of loyalty when a high-echelon employee,[59] misappropriated trade secrets,[60] misused confidential information,[61] solicited employer's customers *prior* to ending employment,[62] or conspired to bring about *mass resignations* of the employer's *key* employees,[63]

---

[55] *Id. citing Ritterpusch*, 119 A.2d 392; *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85, 89 (2d Cir. 1973).

[56] *Id. citing Operations Research, Inc. v. Davidson,* 217 A.2d 375 (Md. 1966), *Ritterpusch,* 119 A.2d 392; *United Aircraft Corp. v. Boreen,* 413 F.2d 694, 700 (3rd Cir. 1969) *other citations omitted.*

[57] *See C-E-I-R, Inc.,* 193 A.2d 374.

[58] *Operations Research*, 217A.2d 375; *and Aetna Bldg. Maintenance Co. v. West*, 246 P.2d 11, 15 (Cal. 1952).

[59] *See Maryland Metals*, 382 A.2d at 568; *citing Riterpusch*, 119 A.2d 392; *and Jet Courier Service, Inc.,* 771 P.2d 486.

[60] *See Space Aero Products Co. v. Darling Co.*, 208 A.2d 74 (Md. 1965), *cert denied,* 382 U.S. 843 (1965).

[61] *See C-E-I-R, Inc.,* 183 A.2d 374.

[62] *See Ritterpusch*, 119 A.2d 392.

[63] *See Duane Jones Co. v. Burke*, 117 N.E. 2d 237, 245 (N.Y. 1954).

Though the defendants fully intended to compete with Scenic and Eagle, there is no specific allegation that they acted fraudulently, unfairly or wrongfully in their departure.[64] They were low-level employees, and only went to hospitals and did not control which hospitals they served. They had no luck recruiting any Scenic employees, and did not solicit flights from Ft. Defiance until *after* they left Scenic. In short, this case involves a commonplace decision by several low-level employees to leave for greener pastures and begin competing with their employer. This is not the stuff from which a breach of loyalty claim can be manufactured.

The cases Scenic relies upon to support its claims are all easily distinguished. All involved some concrete action that affirmatively harmed the employer independently of the harm created by new competition. For example, in the Utah Supreme Court decision in *Registered Physical Therapists, Inc. v. Jepson*[65] (the lead case cited by Scenic), the disgruntled employee removed equipment from a business, converted accounts receivable and monies from the business to his own use, and took critical financial records, all as part of an effort to establish a competing business.[66] Here, there is nothing remotely approaching such a harmful course of conduct.

Another case cited by Scenic -- the Colorado Supreme Court's decision in *Jet Courier Serv., Inc. v. Mulei*[67] – actually supports Simponis and McCracken's position.  The case involved an air courier service, in which a Vice President and General manager of Jet's Western Zone operations

---

[64] *See Maryland Metals*, 382 A.2d at 569; *citing Robb v. Green*, 2 Q.B. 1, 15, aff'd (1895).

[65] 584 P.2d 857 (Utah 1978).

[66] *Id.* at 858.

[67] 771 P.2d 486 (Colo. 1989).

had "autonomy in such matters as the solicitation of business, the operation of the business, and personnel policies." and "received a base salary plus ten percent of the net profits of the Western Zone."[68]  The court suggested that a duty of loyalty could be analogized to on agency law, and pointed to cases which suggested that the higher standard of the duty of loyalty may only be appropriate where "an employee has sufficient authority to act for the employer or access to confidential information to make apt the principal/agency analogy."[69]  The cases cited only applied to officers, directors, high-echelon employees, and "trusted agent or employees" – a far cry from the employees at issue here.  The defendants in this case were a flight nurse, and a paramedic, with no managerial authority or autonomy whatsoever.  In fact they did not even work unless they were "called out" for a flight. Moreover, the court instructed that:

> [A]ctions traditionally taken by departing employees with regard to co-workers leaving simultaneously will not amount to a breach of the duty of loyalty unless other factors, such as the extent of the solicitations or nature of the offers of employment, dictate a finding of a beach of a duty of loyalty. . . . Under this flexible approach, traditional actions by departing employees, such as the executive who leaves with her secretary, the mechanic who leaves with his apprentice, or the firm partner who leaves with associates from her department, would not give rise to a breach of the duty of loyalty unless other factors, such as an intent to injure the employer in the continuation of his business, where present.[70]

This case seems to fit the description of the kinds of "traditional" cases in which no breach of the duty of loyalty occurs.  Moreover, the types of "other factors" that might indicate a breach of the duty of loyalty are not present here.

---

[68] *Id.* at 489.

[69] *Id.* at 492 n. 10.

[70] *Id.* at 497 n.13.

27

Finally, Scenic seems to suggest that a breach of duty can be found here because the defendants took "confidential" information with them.   If true, such an allegation could support a breach of loyalty claim.[71]   But, for the reasons explained earlier, there is no truly confidential information at issue here. As noted, calling customer lists – even lists including a customers' unique preferences – as trade secrets stretches the concept to the point of "unrecognizability."[72]

For all these reasons, summary judgment is appropriate on the breach of fiduciary duty claim. There is also an additional basis for rejecting the claims regarding trade secrets.   Simponis and McCracken correctly point out that if confidential or trade secrets had been involved this claim would fail because it is preempted by the Utah Uniform Trade Secrets Act.[73]   The Trade Secrets Act was designed to displace conflicting tort, restitutionary, and other laws providing civil remedies for misappropriation of trade secrets, except (1) contract remedies, whether or not based upon misappropriation of a trade secret; and (2) other civil remedies that are not based on misappropriation of a trade secret.[74]   None of the exceptions are present in this case, so even if this was a true trade secret case – which it is not – this cause of action would be preempted.

The only remaining claim is a civil conspiracy claim.[75]   To prove a claim for civil conspiracy Scenic must allege (1) a combination of two or more persons, (2) an object to be accomplished (3)

---

[71] *See id., e.g.,* n. 58.

[72] *See Renee Beauty Salons,* 652 A.2d at 1349.

[73] UTAH CODE ANN. § 13-24-1, *et seq.*

[74] UTAH CODE ANN. § 13-24-8.

[75] Complaint paras. 52-55.

a meeting of the minds on the object or course of action (4) one or more unlawful, overt acts, (5) damages as a proximate result thereof. [76]   Notably, if the object of the alleged conspiracy or the means used to attain it is lawful, even if damage results to plaintiff or defendant acted with malicious motive, there can be no civil action for conspiracy.[77]   Since all of the other causes of actions have been eliminated, there is no unlawful motive present, and therefore no conspiracy cause of action can be properly pled.

### III. Additional Discovery and Briefing

For all the foregoing reasons, the court grants defendants Simponis and McCracken's motion for summary judgment.  The court recognizes that its decision rests on grounds that, in part, were briefed by Scenic several months ago, and in the context of a motion for a preliminary injunction. The court is worried, however, about another significant competing concern.  It appears to the court that this case involves a large, well-funded entity (Scenic) attempting to use litigation to maintain a monopoly position and forestall legitimate competitive efforts.  This litigation burden may be particularly substantial when directed at the kinds of lower-level employees who are the defendants here.  For this reason, and for the reason Scenic's case appears to be entirely without merit, the court has stayed further discovery in this matter.

The court wishes to insure that Scenic has a full and fair opportunity to address all of the issues discussed in this opinion.  Therefore, if Scenic believes any of the court's conclusions are in error, it is directed to file a motion for reconsideration of the court's decision to grant summary

---

[76] *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790, 793 (Utah Ct. App. 1987).

[77] *Id.*  At 792.

judgment in this case. That pleading shall include all materials pertinent to the court's summary judgment decision.[78] The brief shall be filed within 21 days of this order and should address the merits of this decision, as well as whether allowing the deposition of defendants Simponis and McCracken would change this result. Defendants Simponis and McCracken are directed to file any response within 21 days of any motion filed. Scenic's reply is due 7 days following.

Scenic is further advised that it appears to the court that summary judgment for defendant Blick's case is appropriate for the same reasons as indicated for the other defendants. It further appears to the court that the cases against defendant Jack Malone should be dismissed for failure to make timely service. Scenic is directed to show any cause to the contrary within 21 days.

## IV. Attorneys Fees

McCracken and Simponis have argued for the award of attorney's fees and costs. Under Utah law, attorney's fees are awarded if a suit is without merit and brought in bad faith.[79] Although the point is arguable, Scenic's suit was not brought in bad faith, and the court denies attorney's fees regarding the litigation to this point. Of course, the defendants are free to file a new motion for fees should subsequent litigation prove to be in bad faith.

## CONCLUSION

The court converts Defendants Simponis and McCracken's motion to dismiss into a motion for summary judgment and grants the motion. If Scenic chooses to file a motion to reconsider, it is directed to file a brief on the schedule noted. Scenic is further directed to show cause why the cases

---

[78] *See Brown v. Zavaras,* 63 F.3d 967, 969 (10th Cir.1995).

[79] *See* UTAH CODE ANN. § 78-27-56.

against defendant Blick and Malone should not be dismissed.   The court DENIES defendant

Simponis and McCracken's motion for a stay of discovery as moot.   The court DENIES Simponis

and McCracken's motion for attorney's fees [70-2].

DATED this ___4ᵗʰ___ day of August, 2003.

BY THE COURT:

Paul G. Cassell
United States District Judge

31

United States District Court
for the
District of Utah
August 5, 2003


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:  2:02-cv-01201


True and correct copies of the attached were either mailed, faxed or e-mailed
by the clerk to the following:


    Mr. Michael P O'Brien, Esq.
    JONES WALDO HOLBROOK & MCDONOUGH
    170 S MAIN ST STE 1500
    PO BOX 45444
    SALT LAKE CITY, UT  84145-0444

    James Blick
    7344 S ARIZONA MADERA DR
    TUCSON, AZ  85747

    Mr. Max D Wheeler, Esq.
    SNOW CHRISTENSEN & MARTINEAU
    10 EXCHANGE PLACE
    PO BOX 45000
    SALT LAKE CITY, UT  84145-5000
    JFAX 9,3630400